******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA, J., joins, concurring. I agree with the majority's answer to the certified question but not its analysis because I believe we should replace the dual design defect standards announced in *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 219–23, 694 A.2d 1319 (1997), with the more modern standard for design defect claims set forth in the Restatement (Third) of Torts, Products Liability.

This case presents our first occasion to directly consider our design defect standards since *Potter* was decided nearly twenty years ago. *Potter* formulated our standards at a time when design defect law was in transition. Courts had acknowledged that the ordinary consumer expectations test, derived from comment (i) to § 402A of the Restatement (Second) of Torts, was ill-suited for judging product design cases because it did not provide sufficient guidance to juries and was often used to deny recovery to plaintiffs for product related injuries. See, e.g., 1 D. Owen & M. Davis, Products Liability (4th Ed. 2014) § 8:4, pp. 714–16. In its place, courts overwhelmingly turned to the risk-utility test, an alternative to the ordinary consumer expectations test, which allows a jury to assess a product design by weighing factors relating to its risks and benefits against those of possible design alternatives. Id., §§ 8:6 through 8:7, pp. 722–26.

Sensitive to criticisms of the ordinary test, *Potter* created the "modified" consumer expectations test by incorporating risk-utility factors into the existing consumer expectations test. *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 220, 222; see id., 221. In formulating its standards, however, *Potter* rejected the approach of a draft form of the Restatement (Third) of Torts, Products Liability, which required, as an essential part of its risk-utility test, that a plaintiff present evidence of a reasonable alternative design. See id., 214–19, 221. Such evidence allows for a jury to assess the manufacturer's chosen design by comparing it against the costs and benefits of adopting a safer alternative. See 1 D. Owen & M. Davis, supra, § 8:10, p. 739. In *Potter*, the court expressed concern that requiring this proof might harm a plaintiff by placing too many evidentiary hurdles along the path to recovery by, for example, forcing the plaintiff to present expert testimony in every case. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 217–19.

Both of *Potter*'s tests were ill-conceived, however, and they remain problematic today, even with the majority's clarification of when each test should be applied. The problems with *Potter*'s standards are not limited to their lack of clarity. More fundamentally, its rejection of a reasonable alternative design requirement

leaves a jury applying its standards without any objective basis against which to assess the product design at issue.

Since *Potter* was decided, a consensus has emerged among courts and commentators that, in design defect cases, proof of some safer and reasonable alternative design is generally necessary to provide the jury with an objective basis for assessing whether a manufacturer's chosen design is defective. See 1 D. Owen & M. Davis, supra, § 8:10, p. 739 ("[C]ost-benefit analysis of an alternative design lies at the heart of design defectiveness. . . . [D]esign defectiveness is usually best resolved by risk-utility analysis, the purpose of which is to determine whether the risk of injury might have been reduced or avoided if the manufacturer had used a feasible alternative design." [Footnotes omitted; internal quotation marks omitted.]). Proof of a reasonable alternative design allows the jury to compare the manufacturer's design against safer alternatives to decide whether the manufacturer could reasonably have made a safer product. See, e.g., id.

Reflecting this consensus, the Restatement (Third) requires proof of a reasonable alternative design. See Restatement (Third), Torts, Products Liability § 2 (b), p. 14 (1998). Notably, however, the Restatement (Third), which was adopted shortly after *Potter* was decided, resolves *Potter*'s stated concerns by incorporating appropriate exceptions to the reasonable alternative design requirement and by making clear that expert testimony is not required in all cases to satisfy this obligation. See id., § 2, comment (e), pp. 21–22; id., § 3, p. 111; id., § 4 (a), p. 120.

In light of these developments favoring the use of a pure risk-utility balancing standard based on proof of a reasonable alternative design, I believe that we should take this rare opportunity to reconsider our design defect standards rather than simply clarifying and reaffirming them, as the majority does today.[1]

On the basis of my review of the Restatement (Third), I am persuaded that we should now adopt the approach set forth therein as an accurate statement of our law controlling design defect claims. The Restatement (Third) has resolved the concerns identified in *Potter* and provides a clearer and fairer method for resolving design claims. Because the Restatement (Third) does not rely on the standards contained in § 402A of the Restatement (Second) of Torts, and does not provide an absolute bar to an action against a cigarette manufacturer for defective design, I join in the majority's answer to the certified question, although not its analysis.

## I

### JUDGING DESIGN DEFECTS: RISK-UTILITY

### BALANCING AND REASONABLE

ALTERNATIVE DESIGN

EVIDENCE

A

Restatement (Third)'s Design Defect Test

Consistent with our product liability law, the Restatement (Third) recognizes three distinct categories of product defect claims: manufacturing defects, design defects, and marketing defects, also called a failure to warn. Restatement (Third), supra, § 2 (a), (b) and (c), p. 14; see also *Hurley* v. *Heart Physicians, P.C.*, 278 Conn. 305, 315, 898 A.2d 777 (2006) ("[a] product may be defective due to a flaw in the manufacturing process, a design defect or because of inadequate warnings or instructions" [internal quotation marks omitted]). Recognizing that each of these categories of defects presents different circumstances, the Restatement (Third) adopts separate liability standards for each category. See Restatement (Third), supra, § 2 (a), (b) and (c), p. 14. The present case implicates our standards for the second category, design defects. See id., § 2 (b), p. 14.

For design defect claims, the Restatement (Third) uses a risk-utility balancing test that allows a jury to decide liability by comparing the risks and benefits of the manufacturer's design against the risks and benefits of adopting a safer alternative. See id. At its core, the risk-utility test asks "whether the safety benefits of remedying a design danger [are] worth the costs." 1 D. Owen & M. Davis, supra, § 8:6, p. 723. It requires a plaintiff challenging a product design to show that the manufacturer could reasonably have designed its product to be safer. See id.; see also T. Jankowski, "Focusing on Quality and Risk: The Central Role of Reasonable Alternatives in Evaluating Design and Warning Decisions," 36 S. Tex. L. Rev. 283, 320 (1995). The jury then compares the risks and benefits of the manufacturer's design against the risks, benefits, and costs of adopting the proposed alternative. See 1 D. Owen & M. Davis, supra, § 8:10, pp. 739–41; see also T. Jankowski, supra, 343. Consistent with the approach of the Restatement (Third), a "vast majority" of courts and commentators agree that the risk-utility balancing test provides the best standard for judging design defect claims. *Evans* v. *Lorillard Tobacco Co.*, 465 Mass. 411, 426, 990 N.E.2d 997 (2013); see also 1 D. Owen & M. Davis, supra, 8:6, p. 724 ("the risk-utility test appears to have become America's preferred test for design defectiveness"); A. Twerski & J. Henderson, "Manufacturers' Liability for Defective Product Designs: The Triumph of Risk-Utility," 74 Brook. L. Rev. 1061, 1067 (2009) ("virtually every major torts scholar who ha[s] looked carefully at the issue of design defect over the past several decades ha[s] embraced risk-utility balancing").

Under the risk-utility test set forth in the Restatement

(Third), a product "is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe . . . ." Restatement (Third), supra, § 2 (b), p. 14. To guide its analysis, the Restatement (Third) provides the jury with a number of factors to weigh in determining whether, in light of these factors, adopting a safer design was possible without greatly increasing the product's costs or risks or greatly diminishing its usefulness. See id., § 2, comment (f), p. 23. These factors include (1) the likelihood and magnitude of foreseeable risks of harm posed by the product's design, (2) the instructions and warnings given with the product, (3) consumer expectations about the product and its usage, (4) the safety risks and benefits of alternative designs, and (5) the feasibility of adopting an alternative design, including effects on the product's cost, functionality, longevity and appearance. See id. Because the relevance and importance of each factor will vary in each case depending on the nature of the evidence, the plaintiff is not required to present evidence regarding every factor to establish his case. See id. If the jury determines that the manufacturer could reasonably have adopted the safer alternative, the manufacturer's design may be deemed not reasonably safe, and thus defective. See id., § 2 (b), p. 14.

Notably, unlike the ordinary consumer expectations test from § 402A of the Restatement (Second) of Torts, the risk-utility test does not treat consumer expectations as dispositive but as one factor among many for the jury to weigh. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 213 and n.10. In making consumer expectations a nondispositive factor, the risk-utility test avoids many of the bars to liability associated with the ordinary consumer expectations test—especially those relating to open and obvious dangers and injuries to foreseeable but unintended users and bystanders. See, e.g., Restatement (Third), supra, § 2, comment (g), pp. 27–28. Thus, a jury may still find a manufacturer liable for obvious product dangers if it finds that the risks posed by a product's design could be mitigated by adopting a reasonable alternative. See 1 D. Owen & M. Davis, supra, § 8:10, pp. 739–41; see also Restatement (Third), supra, § 2, comment (d), p. 20.

Moreover, as I will discuss, the Restatement (Third) does not require expert testimony to establish proof of a reasonable alternative design and recognizes that proof of an alternative design is unnecessary in some limited circumstances. See Restatement (Third), supra, § 2, comment (f), pp. 23–24.

B

Need for Reasonable Alternative Design Evidence

The Restatement (Third) standard is consistent with modern design defect jurisprudence, which recognizes that design defect claims are best decided under a risk-utility standard using proof of a reasonable alternative design, subject to appropriate exceptions.

The need for proof of an alternative design to establish defectiveness in a design case arises from the unique considerations presented by these types of claims. In any product defect case, a jury needs an objective basis against which to compare the product at issue to determine whether the product was defective. See, e.g., T. Jankowski, supra, 36 S. Tex. L. Rev. 292. In manufacturing defect cases, the objective basis for comparison is inherent in the nature of the claim: the plaintiff alleges that the individual unit he received was not manufactured according to its intended design and that this deviation caused harm. See 1 D. Owen & M. Davis, supra, § 7:1, pp. 651–52. To determine whether the unit at issue was in fact defective, a jury need only compare the plaintiff's unit against the intended design to determine whether the two are different.

A design defect case lacks a similar inherent objective basis for comparison. In cases involving design defect claims, the plaintiff's challenge does not concern the individual unit he purchased but the product's specifications. See id., § 8:1, p. 708. In other words, a design defect claim alleges that, although a product may have been manufactured properly according to its design, the intended design chosen by the manufacturer was not reasonably safe. See id. ("unlike a manufacturing defect claim, which implicates merely a single product unit, a design defect claim challenges the integrity of the entire product line and so pierces to the very core of the manufacturer's enterprise"). Any judgment that a product design is defective, therefore, "condemns the entire product line" and not just the unit that the plaintiff purchased. Id. Because a design claim calls the design itself into question, the jury needs some objective basis other than the specifications against which to compare the design at issue in determining whether it was not reasonably safe and thus defective. See Restatement (Third), supra, § 1, comment (a), p. 7 ("when the product unit meets the manufacturer's own design specifications, it is necessary to go outside those specifications to determine whether the product is defective").

The lack of an inherent objective basis for comparison in design cases has made formulating a proper standard for design defect claims a difficult task for courts. See, e.g., 1 D. Owen & M. Davis, supra, § 8:1, p. 702 ("[e]lusive as an elf, the true meaning of 'design defect' largely escaped capture by court or commentator until quite recently, and the search therefor has led inexorably to consternation and confusion"); see also 3A American Law of Products Liability (3d Ed. 2007)

§ 28:5, p. 15 (noting that courts have struggled with standard in design defect cases because such cases do not lend themselves to "readily ascertainable" objective standard).

Following the adoption of § 402A of the Restatement (Second) of Torts, courts attempted to apply its consumer expectations standards to design defect claims. See 1 D. Owen & M. Davis, supra, § 8:3, pp. 713–14. This entails asking a jury whether the product's design met the expectations of the product's ordinary consumers. See 2 Restatement (Second), Torts § 402A, comment (i), p. 352 (1965). If the product falls short of those expectations, it may be deemed defective. See id. The consumer expectations test was created, however, with manufacturing defects in mind. A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1063. For example, a product unit that was made differently from its intended design because of a mistake in the manufacturing process can be understood to disappoint the expectations of its consumers. See id., 1064, 1067. With respect to manufacturing claims, the intended or expected design of the product provides an objective basis for determining the expectations of consumers. 1 D. Owen & M. Davis, supra, § 7:2, pp. 653–54.

As the majority observes in its opinion, however, the consumer expectations test proved unsuitable for resolving many types of design defect claims because that standard was too vague to supply an objective basis for assessing product designs. See id., § 5:16, p. 448; id., § 8:5, pp. 720–21; see also A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1067 (explaining that consumer expectations test has been widely rejected in design cases "as unworkable and unwise"). Consumers often have little or no knowledge about how safe a product design should be and whether it could be made safer. 1 D. Owen & M. Davis, supra, § 5:16, p. 448 ("consumers often have no meaningful idea how safely the product really ought to perform in various situations"). This is especially true for products with complex designs and those that fail in complex ways. See, e.g., *Pruitt* v. *General Motors Corp.*, 72 Cal. App. 4th 1480, 1483, 86 Cal. Rptr. 2d 4 (1999) ("[t]he deployment of an air bag is, quite fortunately, not part of the everyday experience of the consuming public" [internal quotation marks omitted]); R. Dickerson, "Products Liability: How Good Does a Product Have To Be?," 42 Ind. L.J. 301, 307 (1967) ("What, for instance, should the law do about tractors that overturn, surgical implants that break, and rear-engined automobiles that tend to swerve at high speeds?"). Similar problems arise with new products. See R. Dickerson, supra, 307 ("[t]he most troublesome situations are those in which consumer attitudes have not sufficiently crystallized to define an expected standard of performance"). Moreover, expectations often vary between different consumers of the same product, and consumers may have expectations about safety that

are beyond what is feasible for manufacturers to meet. See, e.g., D. Fischer, "Products Liability—The Meaning Of Defect," 39 Mo. L. Rev. 339, 349–50 (1974) ("[e]xpectations as to safety will not always be in line with what the reasonable manufacturer can achieve because the average consumer will not have the same information as experts in the field"). As a result, design defect tests based on consumer expectations often leave a jury with little meaningful guidance when it considers whether a product design is defective, and may lead it to condemn entire product lines without any true understanding of the product's risks and benefits and whether the product could be made safer without eliminating its utility. See A. Twerski & J. Henderson, supra, 1066–67.[2]

The inherent limitations of the ordinary consumer expectations test have led courts and commentators to search for a different standard for design defect cases. Many courts have abandoned the consumer expectations test entirely for design defect claims, whereas some courts have restricted it, as the majority does today, to a small category of cases in which the existence of a design defect is more obvious.[3] See 1 D. Owen & M. Davis, supra, § 5:17, p. 450; see also T. Jankowski, supra, 36 S. Tex. L. Rev. 326; A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1101. Courts have instead looked to the risk-utility standard as a better standard for resolving design defect claims. 1 D. Owen & M. Davis, supra, § 8:6, pp. 722–25 and nn. 1–6 (collecting authorities).

As more and more jurisdictions have embraced the risk-utility test in the decades after the adoption of § 402A, a consensus has emerged that design defect claims are best resolved by using risk-utility balancing to compare the manufacturer's chosen design against safer alternatives to determine whether it was feasible for the manufacturer to have created a safer product. See, e.g., A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1094 ("[r]easonable alternative design is the answer to the comparative balancing process"); see also 1 D. Owen & M. Davis, supra, § 8:10, pp. 740–41 ("[a]s modern products liability developed after the promulgation of . . . § 402A [of the Restatement (Second) of Torts], courts and commentators alike increasingly recognized the logical and practical necessity in most types of design defect cases that plaintiffs prove that their harm would have been prevented if the manufacturer had adopted some alternative design"); annot., "Burden of Proving Feasibility of Alternative Safe Design in Product Liability Action Based on Defective Design," 78 A.L.R.4th 154, 157 (1990) ("The reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is not only relevant in a design defect action, but is at the very heart of the case. The essential inquiry is whether the design chosen was a reasonable one from among the feasible choices of which the defendant was aware

or should have been aware. This feasibility is a relative, rather than an absolute, concept; the more scientifically and economically feasible the alternative is, the more likely it is that the product will be found to be defectively designed.").

This approach of comparing the merits of a product's design against possible alternatives recognizes that a jury cannot meaningfully assess whether a product design is defective without knowing what design alternatives are available, and the risks, benefits, and costs associated with adopting an alternative design. As one commentator has explained: "At the center of a rational process for evaluating design . . . decisions is the requirement of a reasonable alternative proposed by the claimant. This requirement is both eminently fair and necessary. If manufacturer decisions based on complex tradeoffs are being challenged as wrong, it is necessary to understand the alternative decision proposed [that] is being advanced as right." (Footnote omitted; internal quotation marks omitted.) T. Jankowski, supra, 36 S. Tex. L. Rev. 292. Notions of design safety are not absolute, and no product design can ever be entirely accident proof, and, thus, the defectiveness of a manufacturer's chosen design depends largely on whether it could have been made safer by the adoption of some alternative design feature. See D. Owen, "Defectiveness Restated: Exploding the 'Strict' Products Liability Myth," 1996 U. Ill. L. Rev. 743, 754–55. After all, it is generally not unreasonable for a manufacturer to market a product with adequate warnings that serves a useful purpose and cannot feasibly be made any safer. See 1 D. Owen & M. Davis, supra, § 8:10, p. 741 ("Without affirmative proof of a feasible design alternative, a plaintiff usually cannot establish that a product's design is defective. Put otherwise, there typically is nothing wrong with a product that simply possesses inherent dangers that cannot feasibly be designed away."); J. Phillips, "The Standard for Determining Defectiveness in Products Liability," 46 U. Cin. L. Rev. 101, 104 n.18 (1977) ("a manufacturer's product can hardly be faulted if safer alternatives are not feasible" [internal quotation marks omitted]). Moreover, given the significant consequences at stake when a design defect claim is asserted—the condemnation of an entire line of products—it is only fair that some safer alternative be proposed before allowing a jury to declare a product design defective. See 1 D. Owen & M. Davis, supra, § 8:10, p. 741. When, however, it is established that the manufacturer could reasonably have adopted a safer design, it is fair to hold a manufacturer responsible for failing to adopt it. Cf. id., § 8:12, p. 754.

C

Concerns with *Potter*'s Modified Standard

and Its Rejection of a Reasonable

## Alternative Design Requirement

In creating the modified consumer expectations standard, *Potter* replaced our reliance on the ordinary consumer expectations standard from comment (i) to § 402A of the Restatement (Second) of Torts with a similarly problematic standard. Just as with the consumer expectations test, *Potter*'s modified standard also fails to provide jurors with an objective basis for judging a product's design. *Potter* created the modified consumer expectations standard by incorporating risk-utility factors into the ordinary consumer expectations analysis, but without any requirement of a reasonable alternative design. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221. As the majority discusses in its opinion, the court in *Potter* declined to adopt a *draft* form of the Restatement (Third) because it interpreted the draft to require proof of a reasonable alternative design in all cases and without exception. See id., 214–19, 221. The court in *Potter* feared that adopting such a requirement would harm plaintiffs by creating too heavy of an evidentiary burden. Id., 217–19. As a result, the court emphasized, when it created the modified standard, that the availability of a reasonable alternative design was only one factor for the jury to consider rather than a requirement in every case. Id., 221. Without this requirement, however, *Potter*'s modified standard does no better than the ordinary consumer expectations test in providing the jury with an objective basis against which to assess a product's design.

Standards relying on some form of risk-utility balancing without an accompanying requirement of a reasonable alternative design have proven problematic, both in theory and in practice. These standards are not truly risk-utility standards. The risk-utility test and the reasonable alternative design requirement go hand in hand because a proposed alternative design is necessary to provide an objective basis for comparison against the manufacturer's chosen design. The risk-utility test itself does not supply the basis for comparison; rather, it provides only the considerations that guide the comparison. As one commentator has succinctly explained, "one simply cannot talk meaningfully about a risk-benefit defect in a product design until and unless one has identified some design alternative (including any design omission) that can serve as the basis for a risk-benefit analysis." G. Schwartz, "Foreword: Understanding Products Liability," 67 Cal. L. Rev. 435, 468 (1979). Other commentators agree. See, e.g., 1 D. Owen & M. Davis, supra, § 8:10, p. 739 ("cost-benefit analysis of an alternative design lies at the heart of design defectiveness"); T. Jankowski, supra, 36 S. Tex. L. Rev. 292 (explaining that reasonable alternative design requirement "is a sine qua non of the risk-utility process" [emphasis omitted]); T. Jankowski, supra, 326 ("the gravitational pull in design defect cases has been toward the risk-utility

balance and its concomitant, the reasonable alternative design"); A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1094 ("[w]hen one does risk-utility balancing one must judge the product on trial and compare it with some hypothetical design that could have been adopted").

The risk-utility test, which traces its roots to the famed *Carroll Towing* decision; *United States* v. *Carroll Towing Co.*, 159 F.2d 169 (2d Cir. 1947); is predicated entirely on the notion that some alternative measure could have been taken to avoid the plaintiff's harm, and the test was developed as a tool for comparing the allegedly defectively designed product to its alternatives. See, e.g., T. Jankowski, supra, 36 S. Tex. L. Rev. 319 ("[t]he key observation to be made is that the risk-utility test, in order to evaluate the appropriateness of the [design] at issue . . . requires some standard . . . for comparison"); A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1094 ("When one does risk-utility balancing one must judge the product on trial and compare it with some hypothetical design that could have been adopted. Reasonable alternative design is the answer to the comparative balancing process; it is not a factor in the equation as to whether the product was reasonably designed.").

A risk-utility analysis without a reasonable alternative design lacks an objective basis for comparison, leaving the jury with only vague guidance about whether a product design is defective. Without a proposed alternative, the jury is left to compare the product's *own* risks against its *own* benefits, which essentially is like asking the jury to imagine a world with the product and without the product, and to decide which is preferable. M. Green, "The Schizophrenia of Risk-Benefit Analysis in Design Defect Litigation," 48 Vand. L. Rev. 609, 617 n.38 (1995). This puts the jury in the position of having to decide not whether the product could have been made safer, but whether a particular product should have been sold at all—commonly referred to as absolute or category liability, a concept courts have been hesitant to embrace, even in strict liability cases. See A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1069 ("American courts have never imposed category liability, mainly because they intuitively . . . and correctly . . . understand that it would constitute an abuse of judicial power to decide which broad categories of products should not be distributed at all"). Imposing liability for a product, despite the absence of reasonable alternatives, could deprive consumers of an otherwise useful product if the risk of adverse verdicts prompts the manufacturer either to cease production or to significantly increase the cost of the product, rendering it prohibitively expensive for some consumers. Moreover, allowing juries to hold manufacturers liable even if the product serves some useful purpose and cannot reasonably be made any safer risks turning manufacturers into

insurers of their products. See, e.g., T. Jankowski, supra, 36 S. Tex. L. Rev. 324 ("Any logical treatment must recognize that a manufacturer's [design] decision can only be 'wrong' in the context of 'right' alternatives that were available. . . . Without this requirement, the manufacturer becomes an insurer of the product." [Footnote omitted.]). Even the court in *Potter* acknowledged that this kind of absolute liability is antithetical to our product liability laws. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 210 ("strict tort liability does not transform manufacturers into insurers, nor does it impose absolute liability"); see also *Metropolitan Property & Casualty Ins. Co.* v. *Deere & Co.*, 302 Conn. 123, 137, 25 A.3d 571 (2011) (liability standards that essentially convert manufacturers into insurers of their products would be "contrary to the purposes of our product liability laws").

Perhaps because of these theoretical shortcomings, jurisdictions that purport to reject a reasonable alternative design requirement nevertheless appear to require this proof as a practical matter. See, e.g., A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1094–95. For example, commentators have noted that, despite *Potter*'s rejection of a requirement that the plaintiff establish a reasonable alternative design, courts applying the standard established in *Potter* have required this proof in practice. See id., 1068, 1102. In researching product liability cases brought under Connecticut law, these commentators discovered that, at least as of 2009, there were *no* reported cases involving traditional design defect claims since *Potter* that have been submitted to a jury *without* proof of a reasonable alternative design. See id. Ironically, even the plaintiff in *Potter* had presented extensive evidence of design alternatives. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 204–206. So did the plaintiff, Barbara A. Izzarelli, in the present case.

D

Exceptions to Reasonable Alternative

Design Requirement

Courts that have rejected a reasonable alternative design requirement typically do so out of fear of burdening plaintiffs by placing too many evidentiary hurdles along their path to recovery. See, e.g., id., 217–19; see also 1 D. Owen & M. Davis, supra, 8:10, p. 745. *Potter* specifically noted two areas of concern in this regard. First, the court was concerned that it would require expert testimony in every case, including in res ipsa-like cases in which the jury can infer the existence of a defect from circumstantial evidence. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 217–18. Second, the court observed that some product designs could be considered unreasonably dangerous, even if no reasonable alternative design existed. Id., 219.

The Restatement (Third) resolves these concerns, however. First, with respect to the concerns about requiring expert testimony, the comments to the Restatement (Third) explain that expert testimony is not required to meet the alternative design requirement in every case. Restatement (Third), supra, § 2, comment (f), p. 23. The Restatement (Third) does not require plaintiffs to propose or build an entire new prototype of the product—the plaintiff need only show that the manufacturer could reasonably have designed a safer alternative. Id., p. 24. In many instances, a plaintiff can accomplish this without expert testimony. See id., p. 23. For example, no expert testimony is needed when the plaintiff can show that competing products on the market would be safer or when the availability of a safer design is obvious to a layperson.[4] Id.

Second, the Restatement (Third) also expressly recognizes several exceptions to its alternative design requirement. Although, as I discussed previously, courts are justifiably hesitant to impose liability on manufacturers when no safer alternative is available, the Restatement (Third) recognizes that there are circumstances when some consideration other than a design alternative provides a sufficient and fair basis for imposing liability. In each of these instances, a test other than risk-utility balancing is used to determine liability.

First, no such evidence is needed if the product design violates a statute or a regulation. See id., § 4 (a), p. 120. In these cases, proof that the design violates existing law alone is a sufficient consideration to impose liability because manufacturers should not sell products that legislatures or regulatory authorities have decided to ban. See id.

Second, a plaintiff need not proffer alternative design evidence when the product design at issue is manifestly unreasonable. See id., § 2, comment (e), pp. 21–22. The Restatement (Third) acknowledges that, in rare and extreme cases, a product design may be so obviously unacceptable that a manufacturer can fairly be held liable for harm even if no safer alternative is feasible. Id. In these limited instances, a jury may "conclude that liability should attach without proof of a reasonable alternative design" when "the extremely high degree of danger posed by [a product's] use or consumption so substantially outweighs its negligible social utility that no rational, reasonable person, fully aware of the relevant facts, would choose to use, or to allow children to use, the product."[5] Id., p. 22.

Finally, the Restatement (Third) also does not require proof of design alternatives in res ipsa-like cases, in which the very circumstances of a product's failure provide strong evidence that it was defective; for these types of cases, the Restatement (Third) does not require direct evidence of a specific defect. See id., § 3, p. 111.

Instead, it relies on the malfunction theory, which allows a jury to infer the existence of some product defect from the nature of the product's failure, together with evidence showing that its failure was not caused by something other than a defect. See id., § 3, comment (b), p. 112. Because a plaintiff need not identify a specific defect in the product, no alternative design evidence is needed.[6] See id. Consider, for example, a new television that catches fire in a living room during normal use. The plaintiff need not prove that the manufacturer should have adopted a safer design. Liability is instead predicated on the notion that, in the absence of other possible causes, televisions do not ordinarily catch fire during normal use in the absence of some product defect. See, e.g., *Liberty Mutual Ins. Co.* v. *Sears, Roebuck & Co.*, 35 Conn. Supp. 687, 691, 406 A.2d 1254 (1979). As the majority notes, we have already adopted the malfunction theory from the Restatement (Third). See *Metropolitan Property & Casualty Ins. Co.* v. *Deere & Co.*, supra, 302 Conn. 137–39.

These exceptions address each of *Potter*'s stated concerns about requiring alternative design evidence. Notably, the reporters' note to the Restatement (Third) expressly compares *Potter*'s concerns about the reasonable alternative design requirement with the exceptions adopted in the Restatement (Third): "The Connecticut Supreme Court's analysis in *Potter* is, in actuality, perfectly consistent with this Restatement," and it is recommended that, "when the issue is next before [that] court, [it] may find it easier to accept the Restatement as consistent with its position as articulated in *Potter*. Whatever ambiguities in the earlier draft may have misled the court in this regard, those ambiguities have since been eliminated." Restatement (Third), supra, § 2, reporters' note to comment (d), pp. 72–73.

## II

## THE RESTATEMENT (THIRD)'S FUNCTIONAL

## APPROACH TO DESIGN DEFECT CLAIMS

There are additional considerations that favor adoption of the Restatement (Third) for design defect cases. In adopting the risk-utility test, the Restatement (Third) defines its standard "functionally" by focusing on the unique considerations at issue in design defect cases, rather than relying on traditional liability doctrines like strict liability, negligence, contract, warranty, etc. Id., § 2, comment (n), p. 35. This function based approach is in keeping with the modern consensus that different types of product defect cases—manufacturing defect, design defect, marketing defect—each present issues for juries to consider and thus require tests tailored to the type of defect alleged. The older approach of defining product defect standards set forth in the Restatement (Second) of Torts, which used a one-size-fits-all strict liability test (the consumer expectations

standard), proved difficult to apply in many product defect cases. Courts and commentators have since turned to defining product liability standards based on the type of defect alleged, without resort to traditional tort liability doctrines. See 1 D. Owen & M. Davis, supra, § 8:1, p. 707 ("[The consumer expectations standard of the Restatement (Second) reflected a] quest by courts for a general definition of 'defectiveness,' commonly viewed in early products liability as embracing a single principle applicable to any type of case. As products liability law has matured, however, most courts and commentators have come to understand that meaningful evaluation of the acceptability of a product's dangers logically turns on considerations that vary contextually depending [on] whether the problem was one of manufacture, design, or the absence of sufficient warnings." [Footnotes omitted.]).

The Restatement (Third)'s functional approach to design defect cases provides a number of benefits. First, by defining its design defect standard in terms of the unique considerations involved in design defect cases, rather than by resorting to traditional doctrinal liability theories, its risk-utility standard blends beneficial aspects of strict liability and negligence theories without their accompanying drawbacks. Second, relying on a single, unified standard for design defect claims improves clarity by avoiding the confusion and risk of inconsistent verdicts that could result from submitting a claim to a jury under multiple tests and theories (e.g., under the ordinary consumer expectations test, the modified test, and a negligent design theory). Third, adopting a unified standard is consistent with our Product Liability Act, General Statutes § 52-572m et seq., which was intended to simplify pleadings and product liability claims under a single cause of action. I now address each consideration in greater detail.

### A

### Blending Strict Liability and Negligence

Consistent with the modern approach to design defect claims, the Restatement (Third) recognizes that the risk-utility test is neither a strict liability nor a negligence standard, but reflects a blend of the two, and thus displaces those theories in design defect cases. For example, it resembles a negligence balancing standard inasmuch as it requires a jury to balance foreseeable risks of harm against the costs of adopting safer, alternative measures. See 1 D. Owen & M. Davis, supra, § 5:36, p. 501 (noting that risk-utility test is "based on principles of foreseeability and balance that underlie the law of negligence"). At the same time, the risk-utility test embraces strict liability principles because a manufacturer cannot defend itself on the ground that it used reasonable care in selecting its chosen design or that its design is consistent with others used in the industry; as long as the plaintiff demonstrates that the

manufacturer could reasonably have adopted a safer alternative, a jury can find liability without regard to the level of care that the manufacturer exercised in selecting its design. See id., § 5:29, p. 476 (noting that strict liability principles permit liability even if manufacturer used reasonable care in making product).

Some courts, including this court in *Potter*, have claimed that the introduction of risk-utility factors into design defect jurisprudence should not be construed as a departure from strict liability principles, and that the focus of the jury's inquiry must remain on the product, not on the manufacturer's conduct. See, e.g., *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221–22. This is an artificial distinction. See 1 D. Owen & M. Davis, supra, § 5:29, p. 480 (noting that, with respect to design defect cases, there is no practical distinction between strict liability and negligence tests, although "there remains a dwindling, yet stubborn, contingent of courts that cling tenaciously to the view that the doctrines of negligence and strict liability in tort are and must be kept conceptually distinct"). One court explained the fiction as follows: "Although many courts have insisted that the risk-utility tests they are applying are not negligence tests because their focus is on the *product* rather than the manufacturer's *conduct* . . . the distinction on closer examination appears to be nothing more than semantic. As a common-sense matter, [under the risk-utility test] the jury weighs competing factors presented in evidence and reaches a conclusion about the judgment or decision (*i.e., conduct*) of the manufacturer. The underlying negligence calculus is inescapable." (Citation omitted; emphasis in original.) *Prentis* v. *Yale Mfg. Co.*, 421 Mich. 670, 687–88, 365 N.W.2d 176 (1984); see also S. Birnbaum, "Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence," 33 Vand. L. Rev. 593, 610 (1980) ("When a jury decides that the risk of harm outweighs the utility of a particular design [such that the product is not as safe as it should be], it is saying that in choosing the particular design and cost trade-offs, the manufacturer exposed the consumer to [a] greater risk of danger than [it] should have. Conceptually and analytically, this approach bespeaks negligence.").

Because the risk-utility analysis resembles a blend of both strict liability and negligence principles, the Restatement (Third) does not recognize separate negligence and strict liability tests and uses only the risk-utility test as the proper test for all design defect cases. See Restatement (Third), supra, § 2, comment (n), p. 35. Thus, a jury should not receive both a risk-utility and a negligence instruction; only the risk-utility test may be submitted to a jury in cases involving a design defect claim.

The Restatement (Third)'s functional approach com-

bines beneficial aspects of strict liability and negligence theories without their accompanying drawbacks. For example, under the Restatement (Second)'s strict liability test, the ordinary consumer expectations test, a plaintiff can be barred from recovering if his harm was caused by a danger open and obvious to the ordinary consumer, even if the manufacturer could have prevented the danger with a reasonable design modification. See 1 D. Owen & M. Davis, supra, § 8:5, pp. 718–19. The Restatement (Third) eliminates this impediment and, instead, makes the obviousness of a product's danger only one factor for a jury to consider, thereby removing a potential bar to recovery while still allowing the jury to consider evidence on this issue. See Restatement (Third), supra, § 2, comment (g), pp. 27–28.

The Restatement (Third) also avoids trappings often associated with negligence and even contract based theories of recovery, including the requirement that a plaintiff show duty or privity as a prerequisite to recovery. Much of the purpose for moving to strict liability in the first place was to avoid these requirements, which were used by defendants to block recovery in some instances. See id., § 1, comment (a), p. 6. Similar to the strict liability test, the Restatement (Third) expressly omits any privity or duty requirement; a plaintiff need only show that his harm was caused by a defect in the defendant's product to have standing to recover, even if the plaintiff was not a purchaser or a user of the product. Id., § 1, p. 5; id., § 2, p. 14.[7]

Moreover, although the Restatement (Third)'s risk-utility test displaces negligence tests in cases involving design defect claims, it does not prevent plaintiffs from introducing evidence relating to fault when that evidence is relevant to the risk-utility calculus. The Restatement (Third) explains: "In connection with a claim under §§ 1 and 2 and related provisions of this Restatement, the evidence that the defendant did or did not conduct adequately reasonable research or testing before marketing the product may be admissible (but is not necessarily required) regardless of whether the claim is based on negligence, strict liability, or implied warranty of merchantability. Although a defendant is held objectively responsible for having knowledge that a reasonable seller would have had, the fact that the defendant engaged in substantial research and testing may help to support the contention that a risk was not reasonably foreseeable. Conversely, the fact that the defendant engaged in little or no research or testing may, depending on the circumstances, help to support the contention that, had reasonable research or testing been performed, the risk could have been foreseen. Moreover, as long as the requisites in [the risk-utility test] . . . are met, the plaintiff may in appropriate instances—for example, in connection with comparative fault or punitive damage claims—show that the defect resulted from reckless, [wilfully] indifferent, or

intentionally wrongful conduct of the defendant." Id., § 2, comment (n), p. 35.

Finally, it is also important to emphasize that the Restatement (Third)'s risk-utility test displaces other, traditional standards of liability only when the plaintiff seeks recovery for harm caused by a design defect *existing at the time of sale*; the risk-utility test does not apply to design related claims involving the manufacturer's conduct *after* the sale. See id., p. 37. Thus, for example, although only the risk-utility test would apply in a case alleging that an airbag design was defective *when it was sold to the plaintiff*, the risk-utility test would not apply to a separate claim alleging that the manufacturer should have issued a recall of the airbag when it learned that its design was unreasonably causing harm. For that type of claim, the Restatement (Third) acknowledges that negligence could remain an appropriate standard. See id.

### B

### Avoiding Inconsistent Verdicts

This simplified approach of using a single test for all design defect claims also serves an important practical purpose: to avoid the confusion and inconsistent verdicts that could result from submitting two separate standards to a jury to determine the existence of a single defect. For example, suppose a court submits a design defect case to the jury and gives both a risk-utility and a negligent design instruction, and the jury finds for the defendant on the risk-utility theory and for the plaintiff on the negligence theory. The two verdicts are logically inconsistent. If the jury decides that no design defect existed at the time of sale under the risk-utility test, then the manufacturer should not be deemed negligent for selling a product that is not defective.[8] See 1 D. Owen & M. Davis, supra, § 5:29, pp. 481–83. Courts and commentators offer varying explanations for how a jury could reach such inconsistent conclusions. Most explanations involve an acknowledgment that the jury would most likely have been confused in using two standards to decide essentially the same question. See id., p. 483. Worse still, an inconsistent verdict could be the result of a compromise based on considerations other than the jury's proper application of the law to the facts. See id. Sound product liability law should be structured to avoid such results. See id. ("[w]hatever the reason, such findings logically make no sense, are offensive to sound jurisprudence, and ordinarily should not be tolerated").

Mindful of this concern, the Restatement (Third) emphasizes that courts should instruct the jury in a design defect case only on the risk-utility test, regardless of the label a court applies to it. The Restatement (Third) explains that "two or more factually identical [defective design] claims . . . should not be submitted

to the trier of fact in the same case under different doctrinal labels. Regardless of the doctrinal label attached to a particular claim, design . . . claims rest on a risk-utility assessment. To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether 'strict liability,' 'negligence,' or 'implied warranty of merchantability,' would generate confusion and may well result in inconsistent verdicts." Restatement (Third), supra, § 2, comment (n), pp. 35–36.[9]

Formulating liability tests based on the type of defect alleged rather than trying to frame them within traditional doctrinal categories thus improves the clarity and predictability of product liability law and thereby reduces confusion. See 1 D. Owen & M. Davis, Products Liability (4th Ed. Supp. 2015) § 5:38, p. 15; see also Restatement (Third), supra, § 2, comment (n), pp. 35–36.

## C

### Product Liability Act

Adopting the Restatement (Third) approach would be fully consistent with—and help to fulfill—the purpose of Connecticut's Product Liability Act (act), General Statutes § 52-572m et seq., which was intended to simplify product liability actions by requiring a plaintiff to bring all claims against product sellers for product related harm within a single statutory cause of action. See General Statutes §§ 52-572m (b) and 52-572n (a). Prior to the act, product liability claims could be brought under numerous, separate causes of action, each invoking different theories of liability (e.g., negligence, breach of contract, strict liability, and breach of warranty). Each was subject to different statutes of limitations and defenses. To eliminate this patchwork of claims and various pleading requirements, the legislature created a single statutory cause of action, subject to one set of limitations and defenses. This cause of action encompassed all types of claims against product sellers, irrespective of the underlying theory. See *Lynn* v. *Haybuster Mfg.*, *Inc.*, 226 Conn. 282, 292, 627 A.2d 1288 (1993) ("The intent of the legislature was to eliminate the complex pleading provided at common law: breach of warranty, strict liability and negligence. . . . [T]he act was intended to merge various theories into one cause of action rather than to abolish all prior existing rights." [Citations omitted.]). Thus, according to the act, "[a] product liability claim . . . shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." General Statutes § 52-572n (a). The act defines a "product liability claim" to include "all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresen-

tation or nondisclosure, whether negligent or innocent." General Statutes § 52-527m (b).

Although the legislature aggregated existing product liability theories under a single cause of action, it did not provide any substantive elements to decide liability, with the exception of claims based on inadequate warnings, which are not at issue in the present case. See General Statutes § 52-572q (b). Instead, the legislature relied on existing common law to provide those standards and left their further development to the courts. See, e.g., *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 229–30, 245–46 n.34 (refining design defect standards after adoption of act). Our current law, under *Potter*, allows plaintiffs to plead multiple theories of recovery for a single alleged design defect, as long as they do so under the heading of a single "product liability" cause of action. Thus, a plaintiff seeking to recover for a design defect can presently bring a claim premised on many different theories, including for strict liability under the modified consumer expectations test and the ordinary consumer expectations test, and for negligent design under standard principles of negligence. Using multiple tests to address the same essential question sows confusion.

Consistent with the act's purpose of simplification, adopting the Restatement (Third) standard would streamline design defect claims. Using a single standard tailored specifically to design defect claims would do away with the need to plead or prove separate strict liability and negligence theories and avoids the confusing use of multiple theories to address the same underlying issue—whether the manufacturer chose a reasonably safe product design.

D

Rejection of the Restatement (Third)

in Other Jurisdictions

I recognize that some other jurisdictions have also considered and rejected the Restatement (Third)'s design defect standard. See, e.g., *Aubin* v. *Union Carbide Corp.*, 177 So. 3d 489, 510–12 (Fla. 2015); *Tincher* v. *Omega Flex, Inc.*, 628 Pa. 296, 104 A.3d 328, 399 (2014). I find the arguments in these cases unpersuasive. Cases rejecting its approach seem concerned primarily with abandoning the strict liability principles of § 402A of the Restatement (Second) of Torts or imposing burdens on plaintiffs. These concerns, however, appear to me to elevate form over substance and do not reflect the practical considerations involved in design defect cases, which I have explored previously in this opinion. See, e.g., M. Green, "The Unappreciated Congruity of the Second and Third Torts Restatements on Design Defects," 74 Brook. L. Rev. 807, 808–11, 832–36 (2009); T. Jankowski, supra, 36 S. Tex. L. Rev. 318–24; A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1106, 1108;

C. Perkins, note, "The Increasing Acceptance of the Restatement (Third) Risk Utility Analysis in Design Defect Claims," 4 Nev. L.J. 609, 611–12 (2004).

## III

## WE SHOULD ADOPT THE RESTATEMENT

## (THIRD) FOR DESIGN CLAIMS

In light of the foregoing, I would accept the invitation of the reporters of the Restatement (Third) to reconsider the standard that this court employs in design defect cases and to adopt the approach for resolving design defect claims described in §§ 1, 2 and 4 of the Restatement (Third). Doing so will bring our design defect law in line with current product liability jurisprudence and eliminate our reliance on the now outdated consumer expectations standard from the Restatement (Second), which has proven ill-suited for design defect claims.

Adopting the Restatement (Third) approach will not substantially upend our current design defect law. We have already taken a step toward the Restatement (Third) model by adopting the malfunction theory from § 3 of the Restatement (Third). See *Metropolitan Property & Casualty Ins. Co.* v. *Deere & Co.*, supra, 302 Conn. 139–41. Our adoption of the malfunction theory has already supplanted the ordinary consumer expectations standard in such cases, leaving little reason to retain that standard, especially in light of the limited role that the majority has given to it today. See M. Green, "The Unappreciated Congruity of the Second and Third Torts Restatements on Design Defects," supra, 74 Brook. L. Rev. 834–35 (explaining that malfunction theory "encompasses the kinds of cases that were the model for [the ordinary consumer expectations test in §] 402A"); J. Henderson & A. Twerski, "The Products Liability Restatement in the Courts: An Initial Assessment," 27 Wm. Mitchell L. Rev. 7, 21 (2000) (discussing malfunction theory and noting that "most of the cases cited by courts supporting a consumer expectations test are of [the res ipsa] genre"); J. Hoffman, "Res Ipsa Loquitur and Indeterminate Product Defects: If They Speak for Themselves, What Are They Saying?," 36 S. Tex. L. Rev. 353, 377–78 (1995) (explaining similarities between malfunction theory and ordinary consumer expectations test); A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1101 (explaining that modern application of ordinary consumer expectations test is typically "confined . . . to cases that instantiate res ipsa-like product failures").

In addition, *Potter*'s modified consumer expectations test has already introduced risk-utility concepts into our law. See *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 221–22. Although the modified test nominally rejects an alternative design requirement; id., 221; our courts are already requiring this evidence as

a matter of practice. See A. Twerski & J. Henderson, supra, 74 Brook. L. Rev. 1068, 1102. Adopting the Restatement (Third) will thus bring our standards in line with their actual application and thus provide more consistent guidance to courts and juries applying our law.

I would therefore disavow any continued reliance on the ordinary or modified consumer expectations standards and recognize only the risk-utility test from §§ 1, 2 and 4 of the Restatement (Third) as the appropriate test for design defect claims.[10] Res ipsa-like claims would continue to be governed by the malfunction theory that we adopted in *Metropolitan Property & Casualty Ins. Co.*

IV

APPLICATION OF RESTATEMENT (THIRD)

TO CERTIFIED QUESTION

Applying the risk-utility test to the present case, the answer to the certified question is simple: comment (i) to § 402A of the Restatement (Second) of Torts should no longer be the law of this state for design defect claims, and the Restatement (Third) does not contain a similar provision. The expectations of consumers, and even consumer awareness of open and obvious dangers, are not dispositive considerations in the risk-utility inquiry. The comments to the Restatement (Third) explain that, "[e]arly in the development of products liability law, courts held that a claim based on design defect could not be sustained if the dangers presented by the product were open and obvious. [The risk-utility test] does not recognize the obviousness of a design-related risk as precluding a finding of defectiveness." Restatement (Third), supra, § 2, comment (d), p. 20. The comments further explain that the risk-utility test "rejects conformance to consumer expectations as a defense. The mere fact that a risk presented by a product design is open and obvious, or generally known, and that the product thus satisfies expectations, does not prevent a finding that the design is defective." Id., § 2, comment (g), p. 28. Consumer expectations are, instead, one factor for the jury to consider when weighing the risks and benefits of a product design. Id., § 2, comment (f), p. 23.

Consequently, I agree with the majority that we should answer the certified question in the negative. Because I cannot join the majority's analysis in support of this conclusion, however, I respectfully concur in the result only.

[1] The majority declines this opportunity principally because the parties in the present case each relied on *Potter* in their arguments before the United States Circuit Court of Appeals for the Second Circuit. See footnote 11 of the majority opinion. In my view, however, we should not limit our analysis to clarifying and reaffirming *Potter* because, as I note in this opinion, *Potter*'s standards were flawed when they were adopted nearly twenty years ago and remain so today. Moreover, the certified question from the Second Circuit provides that "[t]he Connecticut Supreme Court may modify this

question as it sees fit and add any pertinent questions of Connecticut law that the [c]ourt chooses to answer." *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 731 F.3d 164, 169 (2d Cir. 2013).

[2] For a discussion of other design defect standards that have been considered and rejected, see T. Jankowski, supra, 36 S. Tex. L. Rev. 312–14 (discussing application of " 'deviation from the norm' " and " 'reasonable fitness for intended purpose' " standards to design defect claims).

[3] The consumer expectations test continues to be used in other contexts in which consumer expectations tend to be well formed and more uniform. See Restatement (Third), supra, § 2, comment (h), p. 28 (noting that consumer expectations continue to play strong role in resolution of specialized product defect claims involving food products and used products); see also J. Phillips, "Consumer Expectations," 53 S.C. L. Rev. 1047, 1061–63 (2002) (discussing modern applications of consumer expectations standard).

[4] The comments provide the following examples: "[W]hen a manufacturer sells a soft stuffed toy with hard plastic buttons that are easily removable and likely to choke and suffocate a small child who foreseeably attempts to swallow them, the plaintiff should be able to reach the trier of fact with a claim that buttons on such a toy should be an integral part of the toy's fabric itself (or otherwise be unremovable by an infant) without hiring an expert to demonstrate the feasibility of an alternative safer design. Furthermore, other products already available on the market may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as reasonable alternatives to the product in question." Restatement (Third), supra, § 2, comment (f), pp. 23–24.

[5] The Restatement (Third) uses as an example a novelty item that has little utility but potential to cause significant harm: an exploding cigar used for pranks. It acknowledges that a jury could hold the manufacturer "liable for the defective design of the exploding cigar even if no reasonable alternative design was available that would provide similar prank characteristics. The utility of the exploding cigar is so low and the risk of injury is so high as to warrant a conclusion that the cigar is defective and should not have been marketed at all." Restatement (Third), supra, § 2, illustration (5), p. 22.

[6] Because malfunction theory cases do not turn on proof of a specific manufacturing or design defect, the precise nature of the defect remains undetermined. See Restatement (Third), supra, § 3, comment (b), pp. 111–12. A finding of liability therefore does not condemn the entire product line, making the consequences of liability under the malfunction theory much less devastating to a manufacturer and thus making it fairer to impose liability without requiring proof of a feasible alternative.

[7] In Connecticut, questions of privity and duty are governed by statute. See General Statutes § 52-572n (b) (claim may be asserted regardless of whether claimant purchased product from or entered into contract with product seller). So are other negligence related considerations, like comparative fault. See General Statutes § 52-572o (setting forth comparative fault standards for product liability claims).

[8] Of course, a manufacturer separately may be deemed negligent for failing to recall a product with a latent defect that was not foreseeable at the time of sale.

[9] For example, in adopting the Restatement (Third) approach to design defect claims, the Iowa Supreme Court eliminated use of doctrinal reference in design defect cases: "We question the need for or usefulness of *any* traditional doctrinal label in design defect cases because, as comment *n* points out, a court should not submit both a negligence claim and a strict liability claim based on the same design defect since both claims rest on an identical risk-utility evaluation. . . . Moreover, to persist in using two names for the same claim only continues the dysfunction . . . . Therefore, we prefer to label a claim based on a defective product design as a design defect claim without reference to strict liability or negligence." (Citation omitted; emphasis in original.) *Wright* v. *Brooke Group Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002).

[10] I recognize that we have adopted separate standards for resolving some specialized types of design defect claims, namely, for prescription drugs. See *Vitanza* v. *Upjohn Co.*, 257 Conn. 365, 376, 778 A.2d 829 (2001). Because liability for the design of those specialized products is not at issue in the present case, I do not consider whether we should also apply the Restatement (Third) to claims involving those products.